# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| *versus* | : | CRIMINAL NO. 13-57-SDD-RLB |
| | : | |
| JEFFERY D. PERRY | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Defendant Jeffery D. Perry has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Doc. 708.[1] This motion should be denied because it is unexhausted. Moreover, Because Perry is fully vaccinated, he cannot show that he has an "extraordinary and compelling" reason in support of relief under § 3582(c)(1)(A)(i), even though he has hypertension and is overweight.[2] Notably, Perry has recovered from an asymptomatic case of COVID-19, and his prison has three confirmed, active cases of COVID-19 amongst inmates and staff.[3] This Court should also deny relief on discretionary grounds because Perry has not shown that he poses no danger to the community if released, because the 18 U.S.C. § 3553(a) factors do not warrant a sentence reduction, and because he "has failed to show that BOP's measures for dealing with COVID-19 are inadequate." *United*

---

[1] According to the Notice of Electronic Filing concerning Doc. 706, the United States first received notice of this motion on April 19, 2022, making this response due on May 10, 2022.
[2] *See* Exhibit E at 39, 45; Exhibit F; *United States v. Moore*, No. CR 7-60-SDD-EWD, 2021 WL 2325014 at *3 (M.D. La. 2021) ("In his request, Defendant alleges that he suffers from hypertension . . . and is overweight. Despite these underlying conditions, Defendant's condition does not present extraordinary or compelling reasons for compassionate release because he has now been fully vaccinated with the Pfizer-BioNTech COVID-19 vaccine.") (footnote omitted).
[3] Exhibit E at 46; BOP, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed May 9, 2022); BOP, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed May 9, 2022).

*States v. Leonard*, CR No. 16-114-JWD-EWD, 2020 WL 7311228 at *5 (M.D. La. 2020).

I.   **Perry's offense conduct is disturbing.**

The undersigned has responded to more than fifty of these compassionate release requests over the last two years. Those other cases pale when compared to Perry's. On one level, an accounting of the defendant's crimes is fairly straightforward. In this case, Perry was convicted of fourteen felonies involving guns, drug distribution, and a carjacking. *See* Doc. 650 at 1; Doc. 687 at 5–6, 25–28. His offense level—49—was reduced to 43 because it fell literally off of the chart. Doc. 522 at 42; U.S.S.G. Ch.5, Pt. A, Sentencing Table. He was also responsible for over four hundred kilograms of crack and powder cocaine. Doc. 522 at 34. This, by itself, is no mean feat of criminality.

On another level, measuring Perry's criminality involves a grim form of accounting. Some of the arithmetic seems particularly vulgar here—just try to count the bodies left in Perry's wake. Perry received an enhancement and a cross-reference because he caused the murders of two people—Bernard Lands and Robie Knight. Doc. 522 at 1–10, 35–38. Do you count the third murder? Although not part of his relevant conduct, there was evidence that Perry murdered another person, Valerie "Eyes" Grigsby, in 1999. Doc. 471 at 30, 35; Doc. 522 at 20–22. What about the two young men who accidentally died carrying out the arson Perry ordered? *See* Doc. 522 at 4–6, 35. Notably, Perry ordered the house burned to the ground to drive an elderly man out of the neighborhood because Perry believed that the man living

2

there had the temerity to assist law enforcement (and perhaps also because the elderly man threatened one of Perry's dealers as the dealer was selling crack in front of the elderly man's house). Doc. 522 at 4–5, 35. And how should we account for Charles Richardson? Two days after the arson, the third person Perry hired to carry it out, Richardson, was shot to death. Doc. 522 at 4–6. Finally, whether Perry's drug ring caused any overdose deaths is unknown.

While difficult, this Court weighed this record with care, accounting for these facts (and many more besides). At the first sentencing hearing in 2015, this Court adopted the PSR that outlined evidence describing Perry's involvement in this vicious behavior. *See* Doc. 522 at 10–11. Finding that Perry committed "extreme violence" and acted callously, this Court imposed a discretionary life sentence, explaining in part:

> [Perry's mandatory minimum] sentence takes into account the conduct, size and scale of conspiracy, and number of codefendants. However, before the court are many other acts that the court is to take into account so the whole person is considered regarding the risk to society by the defendant's drug dealing and the actual physical risk to society by the defendant's violent nature. In the past, the defendant has committed crime, but was given the benefit of the doubt many times.[4] The defendant did not take advantage [of] those breaks. In fact, the defendant blames society for failing him. The defendant made his own choices. When the court looks at the entirety of the conduct in the presentence report, the court sees a person who chose to make [his] living illegally, and did whatever it took to protect that illegal enterprise. The instant offense began in 2001 and continued until 2011 and expanded much further than simply dealing drugs. The defendant operated four separate click houses, sold multi[-]kilogram quantities of cocaine and crack cocaine to others. The defendant converted kilogram amounts of cocaine into crack cocaine. In addition, the conduct involved the killing of four or five individuals in an effort to protect the

---

[4] Here, the Statement of Reasons alludes to Perry's criminal history and that he received breaks prior to his sentencing in this case. *See* Doc. 471 at 30–33; Doc. 544 at 16–18, 24–25.

3

> illegal enterprise. The defendant used extreme violence and commissioned others to act out that violence[, i]ncluding setting fire to an elderly man's house and laughing when two children were burned to death while committing the arson.

Statement of Reasons, 4; *see also* Doc. 522 at 24–26; Doc. 544 at 11, 26.

This Court resentenced Perry in 2017. The Court found again that Perry's total offense level was 43 and that he had a criminal history category of III. Doc. 656 at 2; *see also* Doc. 544 at 11. That resulted in a guidelines range of life for twelve of the counts. Doc. 656 at 2–3. The other two counts had a guidelines range of 300 consecutive months and 60 consecutive months, respectively. Doc. 656 at 3. This Court then imposed a guidelines-range sentence of life imprisonment plus thirty years. Doc. 656 at 10. Perry has served about ten-and-a-half years of his life sentence. *See* Exhibit A at 3.

## II. <u>Perry's motion is unexhausted</u>.

The exhaustion requirement is satisfied if "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or if 30 days have elapsed "from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A). "Generally, the defendant has the burden to show circumstances meeting the test for compassionate release." *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (footnote omitted).

Here, Perry has not met his burden of proof. Perry has attached a Reduction-In-Sentence (RIS) request to his motion, but BOP states that it never received it. Doc. 708-1 at 2–3; Exhibit B at 1 (redacted). After looking, BOP found a different

4

RIS request that it received from Perry last year. *See* Exhibit C at 2–3. Parenthetically, this RIS request was denied because his warden sensibly found that Perry's release "would pose a danger to the community." Exhibit C at 1.

Perry's fill-in-the-blank motion for compassionate release (Doc. 708-1 at 5–10) and brief in support (Doc. 708) raise a single claim—that Perry's unspecified medical conditions make him more susceptible to a severe illness caused by COVID-19. *See* Doc. 708-1 at 8–9; Doc. 708 at 3, 8–10. Neither the RIS request that BOP received, nor the one it did not receive, made this argument. Exhibit C at 2–3; Doc. 708-1 at 2–3.

Because exhaustion is an argument-by-argument analysis, Perry is not entitled to relief. *See United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020). Here, Perry was required to submit a RIS request to his warden, wait thirty days after his warden receives the request, then file a motion with this Court and make the *same* argument he made to his warden. The RIS that BOP received in this case does not address any of the same arguments Perry made in his motion. So, his motion is unexhausted and it should be denied without prejudice.

### III. <u>BOP has taken substantial steps to address this pandemic.</u>

#### A. *BOP's response has been extensive and professional.*

Although the pandemic is an unprecedented public health emergency, BOP is eminently qualified to address the threat posed by COVID-19, having dealt with disease outbreaks throughout its history. As BOP put it, "[i]nfectious disease

5

management is a way of life in corrections."[5] Accordingly, drawing on its unique expertise and in consultation with public health experts, BOP undertook "extensive and professional efforts to curtail the virus's spread." *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (citation omitted). BOP has explained that "maintaining [the] safety and security of our institutions is our highest priority."[6]

To that end, BOP implemented a series of modified operations to mitigate the spread of COVID-19 (including policies concerning quarantining and testing), which are intended to protect inmates like Perry. All BOP institutions have "Modified Operational Levels" based on the institution's "COVID-19 medical isolation rate, [the] combined percentage of staff and [inmates who have] completed vaccinations series, and their respective county transmission rates" which affect "operations such as inmate programming and services."[7]

Perry is currently incarcerated at USP Canaan, which is operating at Modified Operational Level 3 and reports that it has zero inmates and three staff members with confirmed, active cases of COVID-19.[8] USP Canaan has a total of 1,238 inmates.[9] In another case involving another institution, this Court found "there is no evidence before the Court that the BOP's plan to address the pandemic

---

[5] BOP, *Information Sheet, Correcting Myths and Misinformation About BOP and COVID-19*, https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf at 2 (May 6, 2020).
[6] BOP, *News Release, Updates to BOP COVID-19 Action Plan: Inmate Movement*, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (Mar. 19, 2020).
[7] BOP, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed May 9, 2022); *see also* BOP, *COVID-19 Modified Operations Plan & Matrix*, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last accessed May 9, 2022).
[8] BOP, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed May 9, 2022); BOP, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last accessed May 9, 2022).
[9] BOP, *USP Canaan*, https://www.bop.gov/locations/institutions/caa/ (last accessed May 9, 2022).

will not adequately protect inmates." *Clark*, 451 F. Supp. 3d at 657; *see also United States v. Stanley*, CR No. 98-106, 2020 WL 6060877 at *5 (M.D. La. 2020) (deGravelles, J.) (similar). The measures taken by BOP at USP Atlanta (at issue in *Clark*) are similar to the measures taken at every BOP facility, including USP Canaan.

Unfortunately, the virus is being transmitted in the streets of Louisiana as well as within the prison walls of BOP institutions. However, evidence that the virus is spreading (or has spread in the past) does not show that BOP's response has been less than professional under the circumstances. Regardless of whether releasing Perry would significantly reduce his chances of contracting COVID-19, the risk is higher than zero both inside and outside of prison.

B. *BOP has been using home confinement in a deliberate manner.*

In light of the pandemic, BOP instituted a priority home confinement program.[10] Following the Attorney General's memoranda, BOP has been assessing inmates for risk factors identified by the CDC for release to home confinement.[11] BOP now has 6,191 inmates in home confinement. "The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 41,814." *Id*. Perry is probably not eligible for home confinement under this program because of his life sentence.

---

[10] Memorandum from then-Attorney General William Barr to Director of the BOP, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic*, https://www.justice.gov/file/1262731/download at 1 (March 26, 2020); Memorandum from then-Attorney General William Barr to the Director of BOP, *Increasing the Use of Home Confinement at Institutions Most Affected by COVID-19*, https://www.justice.gov/file/1266661/download at 1 (April 3, 2020).
[11] *See* BOP, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed May 9, 2022).

7

## IV. Perry's circumstances are not "extraordinary and compelling."

To qualify for compassionate release, Perry must present "extraordinary and compelling" circumstances warranting relief, among other things. 18 U.S.C. § 3582(c)(1)(A)(i). Looking at his medical records, Perry could have argued that he is overweight and has high blood pressure, and that these conditions increase his risk of contracting a severe illness caused by COVID-19. *See* Exhibit E at 39, 45.[12] The CDC has identified certain underlying medical conditions that increase the likelihood of severe outcomes from COVID-19 and these two conditions are on that list.[13] Note that hypertension only "possibly" increases a person's risk. *Id.*

Although not binding, the commentary to the relevant policy statement provides important guidance about what qualifies as "extraordinary and compelling." *See* U.S.S.G. § 1B1.13, comment. (n.1(A)–(C)); *see also United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021).[14] According to the Fifth Circuit, the policy statement "informs" this Court's "analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release." *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021), *cert. denied*, 141 S. Ct. 2688 (2021) (citation omitted). Relevant here, a defendant's serious medical condition should constitute an "extraordinary and compelling" reason if the condition

---

[12] *See also* CDC, *Adult BMI Calculator*, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (Jan. 21, 2022).
[13] CDC, *Coronavirus Disease: People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (April 29, 2022).
[14] The United States maintains that the policy statement and its commentary should bind defendant-filed compassionate release motions. The Eleventh Circuit has agreed with its argument and the Supreme Court chose not to take up the matter. *United States v. Bryant*, 996 F.3d 1243, 1247 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 583 (2021).

"substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, p.s., comment. (n.1(A)).

According to the CDC, "Omicron infection generally causes less severe disease than infection with prior variants."[15] That said, the CDC's advice about the Omicron variant is essentially the same as every variant that came before: "COVID-19 vaccines remain the best public health measure to protect people from COVID-19 . . . . Current vaccines protect against severe illness, hospitalizations, and deaths due to infection with the Omicron variant." *Id*.

Given the CDC's guidance about the COVID-19 pandemic, had Perry not been offered a vaccine, his conditions would have qualified as "extraordinary and compelling" under § 3582(c)(1)(A)(i).[16] But they no longer substantially diminish his ability to provide self-care as Perry has received both doses of the Pfizer-BioNTech COVID-19 vaccine about a year ago and is now fully vaccinated. Exhibit F; *see* U.S.S.G. § 1B1.13, p.s., comment. (n.1(A)). So, Perry's vaccination status means that his circumstances are not extraordinary and compelling. *See Moore*, 2021 WL 2325014 at *3.

District courts "have held almost uniformly that a defendant's vaccination undercuts any claims of 'extraordinary and compelling reasons' based on a high risk

---

[15] CDC, *Omicron Variant: What You Need to Know*, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (March 29, 2022).
[16] Note that, with respect to high blood pressure, the Fifth Circuit has squarely held that this condition is not "extraordinary" in light of the COVID-19 pandemic because it is "commonplace" and is not a terminal illness. *See Thompson*, 984 F.3d at 434.

9

of infection." *United States v. Smith*, 538 F. Supp. 3d 990, 996, n. 8 (E.D. Cal. 2021) (collecting cases). Perry cannot show that his medical conditions qualify for relief unless his risk of severe illness is substantially higher than other inmates, such that his circumstances are in fact "extraordinary." *See* 18 U.S.C. § 3582(c)(1)(A)(i); *Thompson*, 984 F.3d at 434. Here, Perry's vaccination negates any substantial risk of severe illness that might be caused by his medical conditions.

Although Perry is "fully vaccinated," he is not "up to date" as he refused to accept the booster shots offered to him in February of 2022.[17] To the extent the failure to accept a booster shot is relevant, this Court's analysis in a recent case is apt:

> While the vaccine is not 100% effective at preventing COVID-19 infection, it reduces the risk of serious illness or death from COVID-19, even in patients with high-risk medical conditions. For this reason, "[t]he glaring consensus among district courts is that refusal of a COVID-19 vaccine subverts a defendant's compassionate release motion." As one court recognized:
>
>> Defendant cannot establish that his conditions are exceptional and demand immediate release when he intentionally prevents the BOP from mitigating dangers to his health and safety. 18 U.S.C. § 3582(c)(1)(A). A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination. Allowing federal prisoners to qualify for compassionate release by declining to receive a COVID-19 vaccine, without justification, would discourage prisoners from becoming vaccinated. The court is exceedingly hesitant to provide prisoners an incentive to increase their risk of contracting COVID-19 and developing severe symptoms. Such a result would be profoundly counter-productive and would militate against the ameliorative purposes

---

[17] Exhibit E at 50; Exhibit F; *See* CDC, *Stay Up to Date with Your COVID-19 Vaccines*, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html (April 21, 2022).

10

>of compassionate release. Denial of Defendant's request
>for release is warranted on this basis alone.

*United States v. London*, CR No. 15-83-SDD-EWD, 2022 WL 697979 at *3 (M.D. La. 2022) (footnotes omitted).

Moreover, in October of 2020, Perry had a confirmed case of COVID-19 and was asymptomatic. Exhibit E at 46. "[C]ourts have repeatedly denied COVID-19-based motions for compassionate release filed by inmates who . . . have already contracted and recovered from the virus." *United States v. Contreras*, No. 4:18-CR-46(12), 2021 WL 1536504 at *7 (E.D. Tex. 2021) (collecting cases). This Court should deny this motion too—the premise of Perry's request was that his release would help prevent him from contracting the virus. That need vanished when Perry tested positive. *See United States v. Purry*, No. 214CR00332JADVCF, 2020 WL 2773477 at *2 (D. Nev. 2020), *aff'med on other grounds*, 859 F. App'x 217 (9th Cir. 2021). For this added reason, Perry cannot establish extraordinary and compelling circumstances.

## V. **Additionally, Perry cannot show that he is entitled to discretionary relief.**

### A. *Perry cannot prove that he is not a danger to any other person or his community.*

Relief is unwarranted because Perry cannot show he poses no danger to others or to the community. Release should only be available upon a finding by this Court that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2), p.s. (citing 18 U.S.C. § 3142(g)).

Perry cannot make this showing because of his long history of committing violent crimes and distributing narcotics. The record in this case and Perry's sketchy employment history suggest that, for most of his adult life, he has supported himself by selling drugs. *See* Doc. 471 at 44–45; Doc. 522 at 35–36. During his life, his only confirmed, legal employment was verified by his mother when he worked "off and on" for his father. Doc. 471 at 44–45. This employment was likely infrequent and ancient history, as "Perry could not recall the number of hours he worked or the amount he was paid to work for his father." Doc. 471 at 44.

If Perry returns to selling narcotics, then he would present a danger to his community. *See United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989); *see also* U.S.S.G § 1B1.13(2), p.s.; 18 U.S.C. § 3142(g). Congress has found "that drug offenders pose a special risk of . . . dangerousness to society" and that finding is appropriate to apply here. *Hare*, 873 F.2d at 798–799. Perry has not proven that he has changed his ways and will not fall back into old habits.

Perry's criminal history and his conduct pertaining to this offense demonstrates a profound disrespect for the law. *See* Doc. 471 at 30–42; Doc. 522 at 1–25; Doc. 650 at 1. Making matters worse, Perry's lack of remorse during his allocutions in 2015 and 2017 do not suggest he has accepted responsibility for his actions and begun the process of rehabilitation. Doc. 544 at 12–13; Doc. 656 at 3–9. The undersigned does not have cause to justly use the phrase "remorseless killer" often. But Perry *is* a remorseless killer and releasing him would endanger the community.

If necessary, this Court should also consider the efficacy of Perry's release plan because a good plan would decrease his risk of reoffending, while a poor one would increase his risk. *See* Doc. 708-1 at 2, 16; Exhibit C at 3. Perry essentially states that he will live with his fiancée and two of his six children. Doc. 471 at 43; Exhibit C at 3. He does not provide any evidence, other than his own self-serving statements, that he has a promise of employment. In his release plan, he lists three aspirations: (1) to be a manager at the J&A Housing Company, (2) to work at his father's roofing company, Stevenson Association Roofing, and (3) to take a barber examination to obtain a license in that field. *See* Exhibit C at 3. Without any evidence that he has been promised any employment, these statements seem more like a hope, rather than a plan. His past employment history supplies little reason to believe that he will earn a legal, stable income in the future. *See* Doc. 471 at 44–45. Even if Perry had provided a promise of future employment, that alone would not help matters much. There should also be proof that the prospective employer knows his criminal history, there should be an explanation of what his salary and duties would be, and there should be a showing that Perry's job would not involve a significant risk of contracting COVID-19 (assuming his risk of contracting COVID-19 is important). There is little information in this record that suggests that Perry could support himself legally if released. In fact, the record suggests that Perry has rarely financially supported himself (in a legal manner) in his lifetime.

Perry's plan to live with his fiancée and children also leaves unanswered questions (again, assuming his risk of contracting COVID-19 is even important).

Perry's brief statement is not clear about how often the other persons in the proposed home would leave, where they would work, whether the children go to school in person, and whether the living situation would substantially reduce the chance of Perry becoming infected with COVID-19 again. *See Stanley*, 2020 WL 6060877 at *5; Exhibit C at 3.

Moreover, Perry has not proven that he will receive better medical care on the outside. Compare Perry's showing with BOP's. *Compare* Exhibits E and F *with* Doc. 708-1 at 2. BOP has made considerable efforts to keep inmates safe. On the other hand, Perry states that he will pay for medical treatment through Medicare, but there is no proof in the record that he would have Medicare coverage. Doc. 708-1 at 2. Moreover, home confinement would not be a panacea. Perry would "presumably be exposed to others at work, in grocery stores or pharmacies, and in the community." *Leonard*, 2020 WL 7311228 at *5, n. 1 (citation omitted).

In sum, Perry has not provided sufficient proof that he will not reenter the drug trade, commit violence, or otherwise endanger his community if released. Also, there is insufficient evidence to show that Perry can pay for his daily living and medical needs legally upon release—which means he is likely to turn back to crime. And he has not shown that his home is safer than BOP custody. Altogether, this motion and record engenders deep skepticism, not confidence, about Perry's prospects.

B.   *The sentencing factors also do not favor relief.*

Any sentence reduction is unwarranted. Perry's life sentence was well-earned. A reduction would undermine the goals this Court sought to achieve under § 3553(a) when it initially sentenced Perry. *See United States v. Alexander*, CR No. 14-126-JWD-EWD, 2020 WL 2468773 at *8 (M.D. La. 2020). While the facts pertaining to Perry's history and characteristics have been mostly discussed earlier (*see* 18 U.S.C. § 3553(a)(1)), the main reason why the factors do not favor him is because a significant sentence reduction would not reflect the seriousness of the offenses, would not promote respect for the law, would not provide a just punishment, and would not afford adequate deterrence. 18 U.S.C. § 3553(a)(2). If his motion is granted, he will have served a little more than ten years of a life sentence. A reduction would not be just as it would not reflect the seriousness of Perry's drug-dealing and murders. Our community would probably not see a sentence reduction as promoting respect for the law, but as promoting derision of it. Considering Perry's guidelines range and the many decades of mandatory prison he was facing at sentencing, the time he has served cannot be considered a just punishment. And without serving the full measure of this Court's sentence, neither Perry nor those who view the case would be deterred from committing future crimes of the sort for which Perry was convicted.

The efficacy of Perry's release plans should be considered again when deciding whether the § 3553(a) factors warrant discretionary relief. *See* 18 U.S.C. § 3553(a)(1); 18 U.S.C. § 3553(a)(2)(C)–(D). And, again, Perry has not shown that

his plan would be significantly safer than BOP custody. *See Stanley*, 2020 WL 6060877 at *5.

Based on what has been presented, this Court should conclude that Perry has earned his entire sentence. How should this Court consider the § 3553(a) factors "to the extent they are applicable"?[18] It should ask what facts have changed since sentencing that warrant a sizeable sentencing reduction. Considering that his motion is essentially based on a vaccinated person's fear of contracting a severe illness (from which he has already recovered without any symptoms), not much has changed. Here, any sentencing reduction would be an abuse of discretion, even if Perry could somehow show extraordinary and compelling circumstances warranting relief.

      C.    *Relief is unwarranted because BOP's response has been adequate.*

Putting the § 3553(a) factors aside, note that the statute at issue does not require relief under any circumstances—it states that this Court "*may* reduce the term of imprisonment" if all the conditions are met. 18 U.S.C. § 3582(c)(1)(A) (emphasis added). So, discretionary relief can be (and, here, should be) refused even if Perry would otherwise qualify for release. Most notably, discretionary relief should be refused because Perry "has failed to show that BOP's measures for dealing with COVID-19 are inadequate." *See Leonard*, 2020 WL 7311228 at *5.

---

[18] 18 U.S.C. § 3582(c)(1)(A).

16

**VI.    The United States opposes relief.**

For all of the above reasons, the United States opposes Perry's motion for compassionate release. Should this Court grant relief anyway, the United States respectfully requests that the Court order a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from Perry to the public.

UNITED STATES OF AMERICA, by

RONALD C. GATHE, JR.
UNITED STATES ATTORNEY


/s/ Colin Clark
Colin Clark, LBN 33775
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone: (225) 389-0443
Fax: (225) 389-0561
E-mail: colin.clark@usdoj.gov

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | |
| *versus* | : | CRIMINAL NO. 13-57-SDD-RLB |
| | : | |
| JEFFERY D. PERRY | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing United States' Opposition to Defendant's Motion for Compassionate Release was filed electronically with the Clerk of Court using the CM/ECF system. A copy of this filing will be sent to the pro se defendant by United States Mail at:

> Jeffery D. Perry
> BOP Register No. 06450-095
> USP Canaan
> P.O. Box 300
> Waymart, PA 18472

Baton Rouge, Louisiana this 9th day of May, 2022.

> /s/ Colin Clark
> Colin Clark, LBN 33775
> Assistant United States Attorney